## CONTROL OF SCHOOLS SUPPORTED BY ENDOWMENTS.

[Circuit Court of Lucas County.]

STATE, EX REL ROHR, V. ADAM SCHAUSS ET AL.

Decided, October 19, 1901.

*Schools—Endowment of, for Public Benefit Does not make "Public" Schools—Acceptance of Trust Funds for Support of—Authority to Control—Courts can not Interfere with Discretion of Board of Directors—Unless upon Denial of Some Positive Right of the Public—Reasonable Regulations.*

1. The directors of an institution of learning are at liberty under Section 4096, relating to trust funds for the endowment, maintenance and aid of such schools, to reject a proposed donation if the terms under which it is offered are not acceptable, but donations which are accepted must be accepted in accordance with the terms prescribed.

2. A manual training and polytechnical school, founded and supported by private donations which have been accepted under Sections 4095 to 4104, is not a public school in the same sense that schools maintained under our common school system are public schools.

3. The authority to control schools thus founded on endowments is derived from Section 4099, and is vested in a board of directors who may delegate a part of their authority to a faculty, but not to an independent board.

4. There is no authority in the courts to interfere with a discretion exercised by a board of directors of such an institution in the management of its affairs, on the ground that an unwise policy is being pursued, so long as there is no denial of positive rights vouchsafed to the public.

5. A rule which discriminates against the students of a high school during the first half of their freshman year, by rendering it impracticable for them to pursue the course of the special school, is not on that account unreasonable or unjust, or a denial of the rights of such pupils.

PARKER, J.; HAYNES, J., and HULL, J., concur.

Heard on appeal.

This is a proceeding in mandamus brought into this court by appeal. The relator avers in his petition that the Toledo university is supported by general taxation levied by the board of education upon all the real and personal property in the city of

Toledo, and that the persons named as defendants occupy the positions of directors and superintendent of the Toledo university, as indicated by their titles in the caption; that the relator is a resident of the city, and a tax-payer of the city of Toledo, and father and natural guardian of one William F. Rohr, who is a minor and citizen of said city of Toledo; that William F. Rohr is a member of the freshman class of the Toledo high school in the city of Toledo, and as such is pursuing the studies regularly taught in said school; that the Toledo university conducts a manual training school in a building situated upon a certain tract of land described, which, as appears from the averments as well as the evidence, is a part of the lot on which the high school building is situated. The building occupied by the university is really an extension of the high school building. The petition also sets forth that the university occupies this property in question, in pursuance of a certain contract which is in part a lease, that was entered into between the directors of the university and the board of education of the city district, on April 4, 1885. The petition sets forth the various terms of that agreement which I need not notice, other than the provisions touching the right of the relator, and relied upon by him, to-wit:

"It is also agreed between the parties hereto that said party of the second part shall erect upon the premises herein described a suitable building for manual instruction, to be approved by said party of the first part, and shall equip the same with suitable tools and machinery for such instruction, and shall furnish and maintain competent instructors for such manual training; and further, that no charge for instruction in such manual training school shall be made for the children, wards or apprentices of any citizen of said city; and such manual training shall be adapted to and at all times accessible to the pupils of the Toledo high school.

"It is expressly understood and agreed that the purpose of this grant is to secure to the pupils of the Toledo high school a wider and more extended range of instruction than that now furnished, and that the instruction furnished by the said Toledo university shall at all times be such as to be either auxiliary or supplemental to the studies pursued in the Toledo high school."

The relator avers in his petition that by a rule and practice of the directors and superintendent of the university, his said son, who became a member of the freshman class of the Toledo high school is excluded from taking such course in the university as relator believes he has a right to take, and from pursuing such studies as relator avers he has a right and privilege to pursue; that relator's son is prohibited from pursuing his regular course in the Toledo high school, and at the same time pursuing the course that he desires to pursue in the Toledo university. And he says that this rule is a discrimination and prohibition against members of said freshman class; that the rule does not apply to and is not in force as to any other pupils of the university. He says that it "is unreasonable and against public policy, and a violation of the legal rights of each member of said class, especially of said William F. Rohr and of the relator as the parent and natural guardian of said William F. Rohr, and not within the discretion of said defendants."

"That the said defendants, by and through said Virgil G. Curtis, superintendent of said Toledo university, refuses to receive said William F. Rohr in the said school or allow him to enter the same, or to receive any instruction therein, unless he shall abandon and forego receiving any instruction in the Toledo high school, and will sever his connection therefrom, notwithstanding that members of other classes of said Toledo high school are admitted and allowed to receive instruction therein."

The rule to which these objections are made was adopted by the directors of the university on September 5, 1901, and is set forth in *haec verba* in the answer, as follows:

"Resolved, that all regular students entering the ninth grade of the public schools, who shall elect manual training, must pursue the correlative course as prescribed by this board, under the instruction of the teachers of the polytechnic school."

It will be seen that the resolution does not, by its terms, exclude those belonging to the freshmen class in the high school. And the testimony shows that this rule as adhered to is not extended; that is to say, that there is no other rule in force that might operate to exclude such pupils of the high school. This rule does not say that such students shall be prohibited from

entering the manual training school and taking the correlative course. It says that if regular students of the ninth grade of the public schools shall elect and shall take manual training, they shall take the correlative course.

The testimony shows, however, that the enforcement of this rule has the effect of excluding such members of the high school as belong to the ninth grade for the first half of the freshman year, since by this curriculum adopted by the directors of the university, the correlative course of study that is to be taken in connection with the manual training, and the hours prescribed for study and recitations are such to make it impracticable for one to pursue that course and those studies at the same time that he pursues the regular course in the high school. It is in that sense, therefore, that certain members of the freshman class of the high school are excluded from entering the university and taking the manual training at the same time.

Now, what the relator desires is, that his son shall be permitted to enter the university during the first half of his freshman year in the high school and take a certain course there, and not take the full correlative course prescribed in connection with the manual training. That he shall be permitted to take what is dominated "free hand and mechanical drawing;" and he says that his son is fitted for that by education and by the development of his mind, and that his business occupation outside of school makes it desirable that he should have this instruction. He claims, therefore, the right to have his son pursue his studies in the freshman class of the high school, and to pursue such studies as he may elect in the university, i. e., such as will not interfere with the pursuit of his course in the high school. And the question for decision is, whether the court, at the instance of the relator, may interfere with this rule and regulation of the board of directors and superintendent of the university, and require of them that they shall receive this young man upon the terms he desires to have applied to his case.

This is contended for on behalf of the relator on two grounds: First, upon the ground that this right is secured to pupils of the high school by this agreement between the board of education of the city and the directors of the university, which was

entered into on April 4, 1885. And he claims the right as one of the beneficiaries, so to speak, one of the *cestuis que trustent* under that agreement, to enforce it for his own benefit.

It is not clear to us that the effect of the provision in that agreement that the instruction furnished by the university "shall at all times be such as to be either auxiliary or supplementary to the studies pursued in the Toledo high school," and shall be free and open to such students, is to give to every member of the high school, under any and all circumstances, a right to elect such course as he shall choose to pursue in the university. We are not clear, in other words, that such a rule as has been adopted here would be obnoxious to the terms of this agreement. But assuming that it is so, assuming that the agreement was originally enforceable at the instance and for the benefit of the relator, the question arises whether that agreement as to these stipulations is still in full force. It is clear that the right of the relator is dependent upon the agreement, and that if the agreement is not in force, his contention upon that ground must fail. It is equally clear that the authorities that made the agreement may unmake it.

It appears by the evidence that the nucleus, perhaps the substantial foundation, of the fund for this university arose from donations of certain persons formerly citizens of this city, Jesup W. Scott and his heirs, and Mr. Raymond, who gave substantial sums for the establishment of this university. What the terms and conditions were upon which these donations were made we are not advised. Counsel on either side claim nothing on that score. We simply have it that such donations were made. Nothing appears to have been done in pursuance of these donations until a certain act was passed in 1870, for the establishment of the University of Cincinnati, the act as amended being now included in Sections 4095 to 4104, Revised Statutes, and the passage of an act in 1873, which has since been amended (Sections 4105, Revised Statutes), making this act as to the Cincinnati University applicable to the city of Toledo; nor until the common council, in pursuance of that act of the Legislature, had adopted an ordinance which is found in Sections 678 to 683, revised ordinances of the city of Toledo; nor until after this

agreement before referred to had been entered into between the board of education of the city of Toledo and the directors of the university, and the erection and equipping of the building in pursuance thereof.

The date when this school went into operation is not stated, but it was some time subsequent to April 4, 1885, and soon thereafter. As to the character of this school and as to the authority of the board of directors, we must look to the acts of the Legislature before referred to; and as to the agreement between these respective boards, representing the high school and the university, we are to look not only to the lease of April 4, 1885, but to certain subsequent transactions between those boards carried on in pursuance of subsequent arrangements or regulations. And going to the question last stated, we find this state of facts: That at a meeting of the board of education on July 16, 1900, Mr. Dowd, a member of the board, stated that he was in receipt of a communication from Mr. Adam Schauss, president of the manual training board, inviting the board of education to meet with the manual board for the purpose of consultation; that Gen. Hamilton moved that the manual training board be notified that the board of education will meet with them on the next Monday night, and that the clerk should notify them to that effect; and that his motion was carried. That at a subsequent session of the board of education, held on July 23, 1900, for the purpose of meeting with the manual training board in consultation, and for the transaction of other business, Mr. Ashley, on behalf of the university board, appeared before the school board and made certain representations with respect to what the university board had done and what they would like to do—what he conceived to be feasible. The import of it was that the university board desired to extend the course of study.

Up to that time, it appears that the only course of instruction in the university was that pursued in what was called the ''manual training school,'' which consisted chiefly, if not entirely, of what the name would imply, experimental or manual training in certain arts and occupations; and it was proposed to add what they denominated a polytechnic school, for the carrying on of the study of arts and sciences, on what may have

been perhaps more theoretical lines.  This was laid before the board of education, and a committee was appointed to act in conjunction with the committee of the university board, and that committee made a report on August 6, recommending this extension of the studies and instruction in the university, i. e., the establishment of this other branch of the university which they had termed the polytechnic school, and to that report was appended a special report of a proposed curriculum.  That curriculum is not carried into the journals, but it has been presented to us here.  All this was agreed to and adopted by a very decisive vote of the board of education, there being three votes in favor of the motion, and but one against it.

It appears that the course of study that is now being pursued in the university is based upon that curriculum; that in pursuance of this arrangement and agreement with the board of education, the university board on September 5, 1901, adopted the resolution to which I have referred, and to the enforcement of which relator objects.  And thereafter, some members of the board of education, not being satisfied with the result of the operations under this resolution, moved that the university board be requested to set it aside, but that resolution was put to a vote and lost.  It fairly appears to us that so far as the board of education of the city of Toledo is concerned, it is acceding and consenting to the enforcement of this rule as it is enforced with the effect stated.

That being true, it appears to us that the relator is not in a position to rely upon the terms of the lease of 1885 that has been referred to, for the reason that this resolution, as it is interpreted and put in practice, with the knowledge, acquiescence and consent of the board of education, amounts to a modification of the terms of the lease, in so far as it may have secured to all students in the high school a right to enter the university; that if that lease provided that each and every student might enter whatever class he pleased in the university, and might take there such studies as he pleased, that part of the lease has been abrogated by the subsequent transactions of the boards.

That, therefore, leads us to a consideration of the other question, i. e., whether this is a public school, supported by public

revenues, of a character that the relator may ask and require what he seeks; whether he, as the representative of one of the persons entitled to participate in the advantages of the university, may require that its directors shall so modify its rules as to the admission and instruction of students as to accommodate him in the way he desires. We do not understand that this is a public school in the sense that our common schools, established and supported under the general common school system of the state, are public schools. It is a public school in the sense only that the tuition is to be free. The character of the university is, we think, indicated very clearly by the statute providing for its maintenance. Section 4095, Revised Statutes, reads:

"The board of directors of the university of the city of Cincinnati in the name and behalf of the city, may accept and take any property or funds heretofore or hereafter given to the city for the purposes of founding, maintaining or aiding a university, college or other institution for the promotion of free education, and upon such terms, conditions and trusts, not inconsistent with law, as the said board of directors may deem expedient and proper for that end."

That is to say, they may accept of the donation if the terms prescribed by the donors are not contrary to law or are not deemed inexpedient by the board. So that it becomes a school, subject, to some extent, to the terms and conditions of the trust or donation; and in that respect, of course, it is quite different from the common schools. In Section 4096, Revised Statutes, we find this with respect to how the trust funds are to be employed:

"For the further endowment, maintenance and aid of any university, college or institution for the promotion of free education, heretofore or hereafter so founded in said city, the board of directors of the university thereof may, in the name and in behalf of the city, accept and take as trustee, and in trust for the purpose aforesaid, any estate, property or funds, which may have been or may be lawfully transferred to the city for such use, by any person or body corporate having the same, or any annuity or endowment in the nature of income which may be covenanted or pledged to the city toward such use by any person

or body corporate.; and any person or body corporate having and holding any estate, property or funds, in trust or applicable for the promotion of education, or the advancement of any of the arts or sciences, may convey, assign, transfer and deliver over the same to said city as trustee in his or its place, or covenant or pledge its income, or any part thereof, to the same; and such estate, property, funds or income shall be held and applied by such city in trust for the further endowment or maintenance of such university, college or institution, in accordance, nevertheless, with the terms and true intent of any trust or condition upon which the same was originally given or held.''

Since we have not present for our consideration any of the terms or conditions upon which this trust fund was donated, I do not read this for the purpose of the consideration of any question that might arise upon the terms of the donation.  I' read it for the purpose of showing the character of the school; that it is a school that is subject to the terms and conditions imposed by the donors who gave the property or money in trust for the school.  The directors are at liberty to reject a proposed donation if in their opinion the terms are unlawful, or for any reason unacceptable to them.  If they accept it, they must accept it upon the terms prescribed.

We find nothing in this law prescribing that the course of studies shall be so mapped out and arranged and pursued as to permit of all students of the high school, whatsoever may be their class, pursuing their studies in the high school and at the same time taking an elective course in the university; and we know of no rule or principle upon which a court is at liberty to impose that condition or to enforce that kind of a regulation. The agreement between these two boards might so provide; it is possible that before it was modified it did so provide.  It may be that that would have been a fair interpretation of that order.  The directors may have so abrogated their authority, or delegated or surrendered it, as to enter into an arrangement of that kind.  Whether lawfully may be a very serious question, but it is not presented, because the arrangement under which the university is now carried on seems to be acceptable to the directing parties.  The authority in the premises to regulate the school, prescribe the course of studies, and to fix the terms and

conditions upon which students may enter, is placed in the directors, and the terms of the authority are found in Section 4099, Revised Statutes, which says:

"The board of directors may provide all the necessary buildings, books, apparatus and means and appliances, and pass all such by-laws, rules and regulations, concerning the president, professors, tutors, instructors, agents and servants, and the admission, government and tuition of students, as they deem wise and proper; but they may by suitable by-laws delegate and commit the admission, government, management and control of the students, course of studies, discipline and other internal affairs of such university, college, or institution, to the faculty which the directors may appoint from among the professors."

They are authorized to delegate their authority to the faculty, but not to any independent board of education. As I have said, if the interpretation be put upon this contract that is insisted upon by counsel for the relator, then it would seem that the directors of the university had placed substantially the whole matter of the running of the university in the hands or under the control of the board of education; for it would leave it then within the power of the board of education, if it saw fit, to prescribe that students of the high school should be admitted to take such studies as they pleased, at such hours as they pleased, in the university, and if that were the agreement, it would not be within the power of the directors of the university to successfully resist any such regulation as might be prescribed by the board of education. We do not think that that would be consistent with the provisions or the spirit of this law. The only right expressly given by the statute that the relator has here is the right of free tuition, and that right must be pursued subject to such reasonable and proper regulations as may be prescribed by the directors of the university.

Now it appears that students of the high school in other classes than freshmen B (which corresponds with grade 9—2 of the university), are permitted by the university to elect courses there and also at the same time pursue their studies in the high school; but we do not see that because they have adopted this liberal rule as to all classes excepting grade 9—2, they are thereby required to adopt the same rule as to grade 9—2. They

certainly have a wide discretion in the premises which can not be interfered with by a pupil of the school. The only inconvenience to a patron of the school or scholar in the high school is, that he must wait four months before he can enter the university upon these terms; that is to say, before he may elect certain studies and pursue those and none other.

The purpose of this regulation, as claimed by the relator and confessed by the respondents, is to fill up the university and increase the attendance of those who will take the full four years' course prescribed, and this they believe will be of benefit to the university. Whether the policy is wise or unwise is not a question for this court to consider. We would have no right to interfere with this regulation upon the ground, if it were true, that the policy being pursued is an unwise policy. It is within the discretion of the board. They have a right to do that so long as they do not interfere with some positive right of the relator; and where he seeks the enforcement of a right by mandamus, the right must clearly appear; and that the right is denied must likewise clearly appear.

We are not prepared to say that this discrimination against this particular class in the high school (for it is a discrimination, confessedly) is unreasonable and unjust, and so far a denial of the clear rights of pupils in that class of the high school that a court of equity has a right to interfere by mandamus to compel the university directors to so conduct this school as to wipe out this discrimination; and being of that opinion, the prayer of the relator for a writ must be denied.

*W. H. A. Read,* for relator.

*C. K. Friedman,* for defendants.